1

**LAW OFFICE OF KENNETH J. MELROSE**
Kenneth J. Melrose (UT SBN 15512)

2

3851 Via Mitad
Lompoc, CA 93436

3

Telephone: (805) 777-5999
Facsimile:  (559) 732-2305

4

5

Attorneys for Plaintiff
RESORT CENTER ASSOCIATES, LLC

6

7

UNITED STATES DISTRICT COURT

8

FOR THE CENTRAL DISTRICT OF UTAH

9

10

RESORT CENTER ASSOCIATES, LLC, a
Utah limited liability company,

11

12

Plaintiff,

13

v.

14

ANDREW WHEELER, in his official capacity
as Administrator of the United States
Environmental Protection Agency; the
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, SCOTT BAIRD, in
his official capacity as Executive Director of
the Utah Department of Environmental
Quality, the UTAH DEPARTMENT OF
ENVIRONMENTAL QUALITY, the
COUNTY OF SUMMIT, a body politic and
corporate of the State of Utah, UNITED PARK
CITY MINES COMPANY, a Delaware
corporation, and DOES 1-20, inclusive,

15

16

17

18

19

20

21

Defendants.

Case No. 2:21-cv-000078-BSJ

**COMPLAINT FOR:**

**1. DECLARATORY RELIEF**
**2. INJUNCTIVE RELIEF**
**3. INVERSE CONDEMNATION –
TOTAL TAKING**
**4. INVERSE CONDEMNATION –
TEMPORARY REGULATORY
TAKING**
**5. BREACH OF CONTRACT (AS TO
SUMMIT COUNTY)**
**6. NEGLIGENT INTERFERENCE
WITH PROSPECTIVE ECONOMIC
ADVANTAGE (AS TO THE EPA AND
UPCM)**
**7. THIRD PARTY BENEFICIARY (AS
TO THE EPA AND UPCM)**

**DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

Plaintiff RESORT CENTER ASSOCIATES, LLC, a Utah limited liability company ("RCA" or "Plaintiff"), brings this Complaint against Andrew Wheeler, in his official capacity as the Administrator of the United States Environmental Protection Agency ("Wheeler"); the United States Environmental Protection Agency ("EPA"); Scott Baird, in his official capacity as the Executive Director of the Utah Department of Environmental Quality ("Baird"); the Utah Department of Environmental Quality ("UDEQ"); the County of Summit, Utah ("Summit County") (Wheeler, the EPA, Baird, the UDEQ, and Summit County are collectively referred to hereafter as "Defendants"); and United Park City Mines Company, a Delaware corporation ("UPCM"). RCA alleges as follows upon knowledge as to its own acts and upon information and belief as to the acts of others.

## NATURE OF ACTION

1.     RCA brings this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. 99-499 ("CERCLA"), including CERCLA's citizen suit provisions at 42 U.S.C. §§9659(a)(1) and (2). Specifically, RCA alleges that Defendants have engaged, and continue to engage, in violations of the requirements of CERCLA and have failed to perform non-discretionary duties required of them under CERCLA.

2.     As a result, RCA also alleges that Defendants are responsible for the unconstitutional taking of RCA's property by including it as part of the Richardson Flat Tailings Superfund site despite the property's extensive environmental testing, including by the EPA, establishing it as free from hazardous materials. Such designation also prevents RCA from developing its property pursuant to the terms of a 2006 Development Agreement entered into with Summit County. (Attached to the Declaration of Kenneth J. Melrose ("Melrose Decl.") filed concurrently herewith and in support hereof as Exhibit **"A"**.)

3.     RCA further alleges that the EPA and UPCM have tortiously interfered with RCA's development of its property by failing to carry out certain site characterization and cleanup activities as required by the EPA and UPCM pursuant to agreements entered into by the parties in 2009 and 2014. Furthermore, the EPA and UPCM's failure to carry out its duties has

deprived RCA of the benefit of the 2009 and 2014 agreements between UPCM and the EPA, namely the cleanup of Operable Unit 2 and removal of RCA's property from the Richardson Flats Tailings Superfund site.

**PARTIES**

4.      Plaintiff RESORT CENTER ASSOCIATES, LLC is, and at all times relevant to this action, was, a limited liability company duly organized and existing under the laws of the State of Utah engaged in the business of real estate development and investment with its principal place of business in Salt Lake City, Utah ("RCA" or "Plaintiff").

5.      Defendant ANDREW WHEELER is the Administrator of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY. He is responsible for the implementation, enforcement, and administration of the EPA's legal duties under CERCLA, and is named as a Defendant in this suit in his official capacity.

6.      Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA") is the federal agency charged with lawfully administering and implementing CERCLA's substantive and regulatory requirements.

7.      Defendant SCOTT BAIRD is the Executive Director of the UTAH DEPARTMENT OF ENVIRONMENTAL QUALITY and is responsible for the implementation, enforcement, and administration of the Utah Department of Environmental Quality's legal duties under CERCLA and is named as a Defendant in this suit in his official capacity.

8.      Defendant UTAH DEPARTMENT OF ENVIRONMENTAL QUALITY ("UDEQ") is the state agency charged with lawfully administering and implementing CERCLA's substantive and regulatory requirements.

9.      Defendant COUNTY OF SUMMIT ("Summit") is a body politic and corporate of the State of Utah. The COUNTY OF SUMMIT is the local agency charged with creating, administering, and enforcing lawful ordinances.

10.     RCA is informed and believes and, on that basis, alleges that Defendant UNITED PARK CITY MINES COMPANY is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Park City, Utah ("UPCM").

11.     RCA is informed and believes and, on that basis, alleges that the defendants named herein, and each of them, acted as an agent, partner, representative, joint venturer of each of the other defendants along with non-party individuals and entities that participated in doing the things alleged in this complaint.  In carrying out the activities alleged herein, defendants acted within the course and scope of their agency with the knowledge and consent of the other defendants. Accordingly, defendants, and each of them, were the partners, agents, fiduciaries, servants and successors of each of the other remaining defendants and at all relevant times acted within the full course and scope of their agency, employment, authorization and/or succession.

12.     RCA is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these defendants by such fictitious names. RCA will amend this complaint to allege their true names and capacities when ascertained.  RCA is informed and believes, and based thereon alleges, that each of the defendants are responsible in some manner for the occurrences herein alleged and that RCA's damages were proximately caused by defendants and that defendants are otherwise responsible for such damages.

13.     RCA, Defendants, and UPCM are "persons" under CERCLA §101(21), 42 U.S.C. §9601(21).

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, CERCLA §113(b), 42 U.S.C. §9613(b), CERCLA §113(h)(4) and 42 U.S.C. §9613(h)(4).

15.     Venue is proper in this District pursuant to 28 U.S.C. §§1331, 1391(b) and (c), CERCLA §113(b), CERCLA §113(h)(4), 42 U.S.C. §9613(b), and CERCLA §9613(h)(4) because the violations alleged in the Complaint are alleged to have occurred in this judicial district and the damages alleged in the Complaint occurred within this district.

16.     More than sixty (60) days prior to the filing of this action, RCA, pursuant to 42 U.S.C. §9659, gave notice of the violations alleged herein to the Administrator of the U.S. Environmental Protection Agency, the U.S. Attorney General, the State of Utah Department of Environmental Quality, and Summit County (collectively referred to as the "Notices").  True and correct copies of the Notices are attached to the Melrose Decl. collectively as Exhibit **"B"** and are

4

incorporated by this reference as though set forth in full herein.

## GENERAL ALLEGATIONS

17.     RCA's investigation of its claims against the parties responsible for the damages and injuries alleged is ongoing.  The allegations below are made on information and belief and are based on the investigation conducted to date.  RCA will seek leave to supplement or amend this complaint if additional investigation or analysis so warrants.

### *The Richardson Flat Tailings Superfund Site*

18.     The Richardson Flat Tailings Superfund Site ("Site") is located approximately 1.5 miles northeast of Park City, Utah, and is part of a 650-acre property owned by UPCM, a potentially responsible party.  The Site includes a tailings impoundment that covers 160 acres in the northwest corner of UPCM property, a small portion of the much larger Upper Silver Creek Watershed.  The EPA designated the 160-acre tailings impoundment area as Operable Unit 1 ("OU1").

19.     Subsequently, to address contaminants that had potentially been transported downstream of the Site, the EPA created three additional operable units ("OUs"), which essentially included all properties within the floodplain of Silver Creek.  Operable unit 2 ("OU2") includes portions of Lower Silver Creek north and east of U.S. Highway 40.  Operable unit 3 ("OU3") includes a downstream section of Silver Creek known as "the Middle Reach."  Operable unit 4 ("OU4") is an outfall known as Prospector Drain, which collects shallow ground water and discharges it to wetlands near the banks of Lower Silver Creek and into OUs 2 and 3.

### *Historic Mining Activities on the Site*

20.     UPCM is the successor to mining companies that owned and operated the largest mines and mills in the Park City district, and that disposed of tailings in the Silver Creek watershed beginning in the late 1880s.  UPCM was formed in 1953 through the consolidation of Silver King Coalition Mines Company and Park Utah Consolidated Mines Company.  At that time, the Site was already being used as an impoundment for mine tailings.

21.     In 1970, Park City Ventures ("PCV"), a joint venture between Anaconda Copper Company and American Smelting Company, entered into a lease agreement with UPCM.  This

agreement allowed PCV to deposit additional mine tailings at the Site. Eventually, PCV commissioned significant reconstruction of the Site to handle the increased tailing deposits, including installation of a large embankment along the western edge of the impoundment, and construction of containment dike structures along the southern and eastern borders of the Site. PCV also created a diversion ditch system along the higher slopes north of the impoundment and outside of the containment dikes along the east and south perimeters of the impoundment to collect surface run-off. Over the course of PCV's use of the Site until 1982, about 450,000 tons of tailings were deposited through a slurry pipeline that originated at their mill facility.

22.     From 1980 to 1982, Noranda Mining, Inc. leased the mining and milling operations and placed an additional 70,000 tons of tailings at the Site. Since then, no further use of the Site has occurred, but UPCM began taking actions aimed at improving environmental conditions of the Site almost immediately after operations stopped.

### *History of EPA Enforcement*

Operable Unit One

23.     EPA began initial site assessments of the Site in 1984 and originally proposed to add the Site to the National Priorities List ("NPL") in 1988. After considering public comment, EPA removed the Site from NPL consideration in 1991. By 1992, however, the Hazard Ranking System ("HRS") had been revised, and EPA again proposed the Site for listing on the NPL. To date, EPA has not pursued final listing and the Site remains proposed for the NPL.

24.     In September 2000, EPA and UPCM entered into an Administrative Order on Consent ("AOC") requiring UPCM to conduct a remedial investigation and focused feasibility study for OU1. In September 2004, UPCM completed the remedial investigation and feasibility study and EPA published its proposed plan for remedial action. In July 2005, EPA issued a Record of Decision ("ROD") for OU1, thereby selecting the final remedial design for OU1.

25.     In 2007, EPA and UPCM entered into a consent decree, which required UPCM, among other things, to implement the ROD for OU1 and to pay EPA's future response costs for OU1. Although some progress has been made with regard to remediating OU1, it is still in remedial action.

Operable Units 2 and 3

26.     In 2009, EPA and UPCM entered into an Administrative Settlement Agreement and Order on Consent ("2009 Settlement Agreement"), requiring UPCM to prepare and perform a remedial investigation and feasibility study for OUs 2 and 3 and reimburse EPA for its response costs. Subsequently, on or about March 6, 2014, EPA and UPCM entered into an Administrative Settlement Agreement and Order on Consent for EE/CA Investigation and Removal Action, EPA Administrative Docket No. CERCLA-08-2014-0003 (the "2014 AOC"). Among other things, the 2014 AOC obligated UPCM to prepare a sampling and analysis plan and a site characterization report, perform an engineering evaluation and cost analysis ("EE/CA"), implement any selected removal action, and to reimburse EPA for its response costs for OUs 2 and 3. Although UPCM entered into the 2014 AOC, it apparently repeatedly failed to meet its obligations to perform the specified remedial work and reimburse EPA for its response costs.

27.     RCA is informed and believes, and on that basis alleges, that EPA was always aware or should have been aware of UPCM's inability to comply with its obligations under the 2014 AOC. For example, on or about May 2, 2014, UPCM submitted an initial Sampling and Analysis Plan ("SAP") for EPA's review and approval. The EPA deemed the SAP inadequate because it lacked sufficient details and would have resulted in significant data gaps. Only after the EPA repeatedly commented and UPCM repeatedly submitted the SAP was EPA able to approve it. Further, UPCM delayed, without adequate justification, performing required work, such as obtaining access to OUs 2 and 3 and collecting samples.

28.     UPCM's Site Characterization Report was also deficient because, among other things, UPCM failed to evaluate source areas adequately, the nature and extent of contaminated media, and interactions between contaminated areas and surrounding hydrology. These evaluations are fundamental to sufficient site characterization and, ultimately, to support future clean-up decisions. The EPA once again provided UPCM detailed comments and several opportunities to address its concerns, but UPCM repeatedly failed to do so. Moreover, in early 2017, the EPA filed suit against UPCM apparently because of UPCM's failure to comply with the EPA's requests for information regarding UPCM's ability to fund cleanup activities and

reimburse EPA for its response costs.

29.     As a result of UPCM's deficient performance over a span of more than three years, on May 25, 2017, EPA sent a Notice of Work Takeover to UPCM and in June 2017, assumed UPCM's obligations under the 2014 AOC.  Not once during the three years of back and forth with UPCM, did the EPA attempt to formally enforce the terms of the 2014 AOC.  It was not until almost five years later, in early 2019, that the EPA filed suit against UPCM seeking to enforce UPCM's obligations.

30.     Ultimately, despite over ten years of activities related to OUs 2 and 3, no final Record of Decision outlining a comprehensive cleanup plan has been issued and OUs 2 and 3 are still being remediated.  Consequently, RCA has been unable to obtain the necessary approvals from EPA, UDEQ, and Summit County to develop its Property.

### *RCA's Property and History of Environmental Testing*

31.     The Pace Ranch ("Ranch") is located near Park City, Utah, and is contiguous with Interstate-80 on the north and the State of Utah Rail Trail on the West.  The Ranch has been owned by the Pace family since 1875.  In December 2005, the Pace family conveyed, in two conveyances, 191 acres of the northern portion of the Ranch (the "Property") to RCA.  This portion of the Ranch lies east and upgradient of the State of Utah Rail Trail and is located entirely outside of the Silver Creek floodplain and OU2.

32.     RCA discovered the concerns relating to mine tailings in the Silver Creek floodplain during its pre-acquisition due diligence.  As a result of that due diligence, all portions of the Ranch located within the floodplain were subdivided and conveyed to Park City prior to RCA's purchase of the Property.  RCA has never held title to those portions of the Ranch.  In 2004, RCA commissioned a Phase One environmental site assessment prior to its acquisition of the Property, which concluded that "no Recognized Environmental Conditions are likely to exist on the Property."

33.     After its acquisition of the Property, in 2006, RCA entered into a Development Agreement with Summit County that permitted the development of 18 one-plus acre lots on the south portion of the Property, on entirely uncontaminated land (the "Development Area").  The

rest of the Property, including the only areas with any purported evidence of minimal contamination, would be dedicated as permanent open space.

34. On May 30, 2007, pursuant to the Development Agreement with Summit County, RCA's contractor, Granite Environmental, Inc., conducted a two-phased environmental site assessment on the Property. The site assessment report showed that all surface soil samples collected from within the Property boundaries were below the Lower Silver Creek soil screening levels established by the EPA. Ultimately, the report concluded that "the Pace Ranch property…has had little in the way of metals enhancement, due to nearby milling operations, and the property presents no risk to future inhabitants from these historic activities."

35. In the fall of 2007, EPA contracted with Tetra Tech, a consulting and engineering firm, to conduct extensive soil sampling on the Property. Tetra Tech performed surface samples from a total of 39 sampling locations on the Property and analyzed for lead and arsenic. The maximum reported concentration in surface soil was 241 mg/kg lead and 13.9 mg/kg arsenic. In addition, subsurface soil samples were collected at four other locations on the Property and the maximum reported concentrations were 101 mg/kg lead and 10.2 mg/kg arsenic. All samples were well below the soil screening levels adopted for OU1 of 500 mg/kg lead and 100 mg/kg arsenic.

36. In 2008, Summit County passed ordinance number 692 (the "Ordinance"), which created a temporary overlay zone regarding contaminated soils and water within the Lower Silver Creek drainage area. With respect to new development in the overlay zone, the Ordinance provided that the developer "shall obtain a soils study and shall show evidence that the development area is outside of the impacted area or shall propose a plan to remediate any environmental problems identified in the study to the satisfaction of the Utah Department of Environmental Quality and EPA" before granting building permits. Initially, under the Ordinance, any remediation activities could be addressed through the State of Utah's Voluntary Cleanup Program ("VCUP") or another cleanup plan approved in advance by EPA, UDEQ, or Summit County. However, RCA did not pursue cleanup under VCUP because, as indicated in the prior environmental assessments, *there was nothing to clean up.*

37.     At some point after Summit County implemented the Ordinance, and as discussed above, EPA expanded the boundaries of the Site to include OUs 2 and 3. In doing so, the EPA included the Property in its designation of the area covered by OU2, even though no portion of the Property fell within the Silver Creek floodplain and despite the fact that there had never been *any* evidence of contamination. The only explanation as to why the Property was included in the EPA's expansion of the Site is because it was, at one time, part of the larger Pace Ranch, which had long since been subdivided and its wetlands and water rights had been conveyed to Park City. The inclusion of the Property within the Site triggered the requirements of the Ordinance. Nevertheless, in an attempt to extricate the Property from the newly expanded Site boundaries, RCA provided the EPA and UDEQ with information regarding the subdivision of the Property and the studies showing no contamination. The EPA and UDEQ ignored the information even though it established that the Property was free from contamination and that the floodplain portion of the Ranch had been conveyed to Park City years earlier.

38.     In January 2014, to satisfy the requirements of the Ordinance, RCA commissioned another environmental assessment, which was conducted by Sage Environmental, LLC ("Sage"). The study's purpose was to further delineate the extent of lead impacts on the Property. Sage's assessment found *no* contamination on the Property. Instead, testing revealed a small structure, comprising less than 1,000 square feet, known as the Wortley Loading Dock (the "Dock"), that contained four samples that were higher than designated EPA standards—however, this was at all times *separated* from Plaintiff's Property by a former railroad track, now a rail-trail, and a split-rail fence, which placed the Dock approximately one hundred feet *beyond* the edge of the Property.

39.     In 2015, apparently pursuant to the 2014 AOC, UPCM implemented an EPA-approved Sampling and Analysis Plan on the Property. UPCM personnel, accompanied by representatives from EPA's Region 8 office and Sage, conducted extensive sampling on the Property. The results of this sampling were published in a 2016 report by Sage and showed no contamination above EPA established thresholds on the Property, let alone in the proposed

Development Area. Although samples were again slightly elevated near the Dock[1] and the previously-conveyed wetland areas, neither of those areas were located within the Property.

40.     In June 2017, despite the extensive testing already conducted on the Property, the EPA and Summit County requested yet another report be completed, but this time focusing on the proposed Development Area. RCA once again complied and commissioned Sage to complete another analysis on its behalf. The assessment concluded:

> "The result of extensive soil sampling conducted on the 18 lot Silver Gate Ranch development indicates that while arsenic and lead concentrations are somewhat elevated relative to site-specific background concentrations, they are well below recent remedial action levels using other similar mining impacted sites in Utah. Based on this comparison, we conclude that the proposed development area is outside of the impacted areas on the Richardson Flats Tailings Site."

41.     Regardless of the clear absence of any hazardous materials in excess of remedial action levels at the Property, EPA has continued to insist on continuing characterization and remediation activities at the Property that it assumed from UPCM pursuant to its Notice of Work Takeover in 2017. As a result of the EPA's continuing activities with regard to OU2, Summit County refuses to issue a development permit for the Property to RCA on the erroneous grounds that RCA has not satisfied the requirements of the Ordinance. Further, the UDEQ and Summit County have required RCA to place a warning on each plat that the Property could contain hazardous material, completely stymying RCA's ability to effectively market and sell any lots located on the Property in the uncontaminated proposed Development Area.

42.     On April 12, 2017, RCA's counsel wrote representatives of EPA's Region 8 Office regarding both the EPA and private studies showing no contamination at the Property and requested that EPA issue a no further action letter with regard to any cleanup activities at the Property or that the EPA take or authorize RCA to take such other actions that would allow RCA to proceed to develop the Property. (April 12, 2017 Letter from RCA's counsel to EPA general

---

[1] Of the testing done around the Dock, only sample OU2-SO-OP1 revealed elevated levels of lead/arsenic. However, as discussed above, the Dock and that sample were taken from a property *adjacent* to Plaintiff's Property. (Exh. **"C"** to Melrose Decl., Email from Laurie Goldner discussing Dock sample, emails from RCA's legal counsel *repeatedly* following up with Amelia Piggott about removing the Property from OU2; Exh. **"D"** to Melrose Decl., Photograph of sample OU2-SO-OP1 excavation site.)

counsel Amelia Piggott, attached to Melrose Decl. as Exh. **"E"**) The no further action letter would serve as confirmation of a prior informal notification to RCA's principal, Walter J. Plumb III, and RCA's then-legal counsel, Steven D. Peterson, by EPA's Responsible Project Manager, as well as the EPA's general counsel, Amelia Piggott, during a 2016/2017 meeting between RCA, Summit County, and the EPA, that the EPA's sampling at the Property showed no issue of concern. (Declarations of Walter J. Plumb III and Steven D. Peterson are attached to Melrose Decl. as Exhs. **"F"** and **"G"**, respectively.) Moreover, a no further action letter or other EPA directed activity would satisfy Summit County and allow RCA to proceed with its proposed development on the Property. Since that time, the EPA, UDEQ, and Summit County have taken no action.

43. Due to the combined actions and omissions of EPA, the UDEQ, and Summit County, RCA has been left in a legal and administrative limbo for over a decade with respect to the Property. RCA has been more than cooperative in accommodating environmental testing on its Property, which have uniformly demonstrated a complete lack of contamination, certainly in the proposed Development Area (and likely, the entire Property), but despite its numerous requests, RCA has been unable to gain approval of the development and sale of that portion of the Property. Additionally, it is probable that even the small portion of the Property in which elevated samples were collected, near the Dock, is actually free from contamination, given the flawed means of collection of samples there. As a result, RCA has missed several opportunities to sell the Property and, in turn, has lost opportunities to invest profits from the sale of the Property, while continuing to incur taxes and maintenance costs.

44. Moreover, UPCM, ostensibly responsible for the remediation of the Property under the 2014 AOC, has undertaken no action to clean up the purportedly contaminated Dock, or the previously-conveyed wetlands. Neither has UPCM ever been directed to do so by EPA, despite repeated testing shared by RCA with EPA, showing contamination at those sites.

## FIRST CLAIM FOR RELIEF

### (Citizen Suit Claim Pursuant to 42 U.S.C. §9659(a)(1))

45. RCA realleges and incorporates by reference the allegations set forth above in the

preceding paragraphs as though set forth in full herein.

46.     42 U.S.C. §9656, under which RCA brings this action, is CERCLA's citizen enforcement provision.

47.     Section 9656(a) allows any person to commence a civil action "against any person…who is alleged to be in violation of a standard, regulation, condition, requirement, or order which has become effective pursuant to [CERCLA]".  42 U.S.C. §9656(a)(1).  Each defendant named herein is a "person" within the meaning of 42 U.S.C. §9601(21).

48.     Defendants have violated and continue to violate the standards, regulations, conditions and requirements under CERCLA including, without limitation, the following:

a.     Defendants have failed to establish the requisite criteria to even implement any response activities at the Property.  CERCLA only authorizes the EPA to remove or arrange for the removal of hazardous material whenever: "[A]ny hazardous substance is released or there is a substantial threat of such a release into the environment, or there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare."  CERCLA §104, 42 U.S.C. §9604.

b.     As described above, multiple environmental tests and studies done over the course of a decade all confirm that no "hazardous substance [has been] released" on the Property, including the proposed Development Area. Such testing has also revealed that there is no "substantial threat of or such a release" and neither is there "an imminent and substantial danger to the public health or welfare."

c.     At the time of its decision to expand the Site to include OU2, which encompasses the Property, EPA only had access to the results of Tetra Tech's 2007 sampling, which uniformly demonstrated no contamination of the Property, thus, EPA's decision at the time to include the Property in OU2 was made without *any* evidence, rendering it arbitrary and capricious.

d.     Moreover, while later testing in 2014 by Sage and in 2015 by UPCM pursuant to the SAP revealed some elevated levels of lead near the Dock, such contamination was

always *highly confined* to an area of less than *one thousand square feet* around the Dock itself, and was *never* on Plaintiff's Property, being, instead, at least one hundred feet away from the western edge of the Property, on the other side of a rail trail. The actual Property, including, critically, the Proposed Development Area, was confirmed several times over multiple rounds of extensive testing to be free of contamination in excess of acceptable levels. Thus, EPA's decision to place the *entire* Property in the OU2, even if based on the 2014 and 2015 testing results (which it was not) was still in excess of its powers authorized under CERCLA because such testing revealed there was no hazardous substances were present *anywhere* on the Property, which EPA always *had actual knowledge of.*

e. Likewise, any contamination of the wetlands confirmed by UPCM's 2015 testing, never had any bearing on the EPA's decision to include the Property in the OU2, because despite having once been a part of the overall "Pace Ranch" the wetlands were subdivided and conveyed to Park City *before* Plaintiff completed its purchase of the Property—they were never part of the Property, and Plaintiff never held title to them. As a result, the contamination of the wetlands was never a basis for later attachment of the EPA's jurisdiction to the Property itself under CERCLA.

f. Given the lack of evidence of contamination of the Property, the EPA had and continues to have *no authority* to engage in any removal action on the Property and certainly lacks any authority over those areas where no contamination is present, i.e. EPA's jurisdiction and authority under CERCLA never attached to the Property, and certainly had not attached as of the time the decision was made to include the Property in OU2. To the extent EPA's jurisdiction and authority ever did attach, it would have been limited to the small, discrete and static area of contamination around the Dock, which, as has been discussed, is not a part of Plaintiff's Property, nor is it even contiguous with Plaintiff's Property. As such, by engaging in removal action on a property that is free from hazardous material, EPA has violated the prerequisite conditions or requirements of 42 U.S.C. §9604. In essence, EPA never had any authority to regulate the Property.

g. In the event EPA is nevertheless authorized to implement a removal action

on the Property, EPA has completely failed and continues to fail to comply with the requirements under the mandatory duty of timeliness and to avoid unreasonable delay and under 42 U.S.C. §9604(a) and 5 U.S.C. §706(1).

    h.    EPA has been apprised of the purported contamination at the Dock and certain wetlands areas dedicated to Park City years prior, since at least 2014, and has nevertheless failed to require UPMC to remediate those areas pursuant to the AOC for the last *seven* years.

    i.    Defendants failed and continue to fail to comply with requirements in other regulations and directives to be identified during discovery.

49.    Moreover, as a result of EPA's violations of CERCLA, the UDEQ and Summit County have required RCA to place a warning on each plat notifying potential buyers that it could contain hazardous materials.

50.    As a direct and proximate result of the acts, omissions, and conduct of Defendants, RCA has suffered damages. Namely, RCA is unable to obtain the necessary approvals from Summit County to develop, market, or sell any portion of its Property.

51.    RCA is entitled to the following relief:

    a.    A declaration from the Court that Defendants have violated, and continue to violate, the provisions of CERCLA §9604.

    b.    An order from the Court pursuant to CERCLA §310, 42 U.S.C.§4659 that the EPA comply with the requirements of CERCLA and that EPA take such action to correct the violation.

    c.    Affirmative injunctive relief requiring the EPA to remove the Property from the boundaries of OU2 and the Site or, in the alternative, that EPA issue a no further action letter regarding the Property that would satisfy the requirements of the Ordinance.

    d.    In the alternative, an order from the Court requiring EPA to issue a final Record of Decision and complete any remaining cleanup activities related to the Property.

    e.    Affirmative injunctive relief requiring UDEQ and Summit County to allow RCA to remove any and all warnings or restrictions from each plat on the Property, or alternatively, allowing RCA to propose and complete a cleanup plan that will satisfy the

Ordinance.

## SECOND CLAIM FOR RELIEF

### (Citizen Suit Claim Pursuant to 42 U.S.C. §9659(a)(2))

52.     RCA realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though set forth in full herein.

53.     42 U.S.C. §9656, under which RCA brings this action, is CERCLA's citizen enforcement provision.

54.     Section 9656(b) allows any person to commence a civil action "against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency…) where there is alleged a failure…to perform any act or duty under [CERCLA],…which is not discretionary with the President or such other officer." CERCLA §310(a)(2), 42 U.S.C. §9656(a)(2).

55.     Each defendant named herein is a "person" within the meaning of CERCLA §101(21), 42 U.S.C. §9601(21).

56.     Defendant EPA has failed and continues to fail to perform non-discretionary acts and duties under 42 U.S.C. §9659(a)(2).  Primarily, CERCLA prohibits the EPA from allowing a private party to undertake a remedial investigation, conduct a feasibility study, or carry out any other action at a site unless it determines that "such action will be done properly and promptly." CERCLA §104(a), 42 U.S.C. §9604(a).

57.     Over a decade has elapsed since EPA and UPCM initially agreed to begin characterizing the environmental condition of OU2 pursuant to the terms of the 2009 Settlement Agreement, which were reiterated by the 2014 AOC.  Since EPA assumed UPCM's obligations due to its deficient performance, a Record of Decision containing a final remedial action plan for OU2 has still not been issued.

58.     Moreover, as a result of EPA's violations of CERCLA, the UDEQ and Summit County have required RCA to place a warning on each plat notifying potential buyers that it could contain hazardous materials.

59.     As a direct and proximate result of the acts, omissions, and conduct of the EPA,

RCA has suffered and will continue to suffer damages. Namely, RCA is unable to obtain the necessary approvals from Summit County to develop the Property. Moreover, due to the warning required by UDEQ and Summit County, RCA has been unable to effectively market and sell any portion of the Property.

60. Based on the above, RCA is entitled to the following relief:

a. A declaration from the Court that the EPA has violated, and continues to violate, a non-discretionary duty as required under CERCLA, as described above.

b. An order from the Court pursuant to CERCLA §310, 42 U.S.C.§4659 that the EPA comply with the requirements of CERCLA and that the EPA immediately take such action to correct the violation, issue a Record of Decision, complete any cleanup activities related to the Property, and issue a no further action letter with respect to the Property.

c. Alternatively, an order from the Court allowing RCA to propose and complete a cleanup plan related to the Property.

### THIRD CLAIM FOR RELIEF

### (Inverse Condemnation – U.S. Constitution, Amend. 5)

61. RCA realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though set forth in full herein.

62. The Fifth Amendment of the United States Constitution prohibits the government from taking private property for public use, without just compensation.

63. Since the expansion of OU1 and OU2 by EPA in or around 2009, which resulted in the inclusion of the Property within the boundaries of the Site by EPA, RCA has, as a direct result, been unable to obtain the necessary permits from Summit County to develop the Property. RCA has put forth numerous environmental reports establishing again and again that the Property, and, critically, the Development Area, are free from contamination above acceptable levels, yet Defendants will still not issue an approval or no further action letter. As such, RCA has been deprived of its reasonable investment-backed expectations and all economically feasible and beneficial use of the Property.

64. The actions of Defendants were arbitrary and capricious and not reasonably or

substantially related to any legitimate or recognized governmental interest. RCA is informed and believes, and, based thereon, alleges, that based on such arbitrary and capricious conduct, it was Defendants' intent to effectuate a taking of the Property without just compensation, and no compensation has been paid.

65. As a direct and proximate result of the unconstitutional taking, RCA has suffered damages in an amount to be proven at the time of trial.

66. RCA has been required to retain legal counsel to pursue legal redress for Defendants' wrongful conduct. Accordingly, RCA is entitled to recovery of its attorneys' fees, costs of suit, fees and expenses pursuant to 42 U.S.C. §4654 and other applicable laws.

### FOURTH CLAIM FOR RELIEF

### (Inverse Condemnation – Temporary Regulatory Taking)

67. RCA realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though set forth in full herein.

68. The Fifth Amendment of the United States Constitution prohibits the government from taking private property for public use, without just compensation. U.S. Const., Amend V.

69. RCA seeks just compensation for the period of time during which it has been deprived of its reasonable investment-backed expectations and substantially all reasonable economic use of its Property as a result of the inclusion of the Property within the boundaries of the Site by the EPA in or around 2009.

70. The actions of Defendants were arbitrary and capricious and not reasonably or substantially related to any legitimate or recognized governmental interest. RCA is informed and believes, and based thereon alleges, that it was Defendants' intent to effectuate a taking of the Property without just compensation, and no compensation has been paid.

71. As a direct and proximate result of the temporary unconstitutional taking, RCA has suffered damages in an amount that exceeds the jurisdictional minimum of this Court, plus interest, the precise amount to be proven at the time of trial.

72. RCA has been required to retain legal counsel to pursue legal redress for Defendants' wrongful conduct. Accordingly, RCA is entitled to recovery of its attorneys' fees,

costs of suit, fees and expenses pursuant to 42 U.S.C. §4654 and other applicable laws.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract as to Defendant Summit County only)

73.     RCA realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though set forth in full herein.

74.     In 2006, RCA entered into the Development Agreement with Summit County. The Development Agreement permitted RCA to develop 18 one-acre lots on a completely uncontaminated portion of the Property.

75.     Subsequently, in 2008, while RCA pursued development of the Property pursuant to the Development Agreement, Summit County passed the Ordinance.  To comply with the Ordinance, RCA conducted and submitted several soil sampling reports to Summit County, most recently in 2017.  The soil sampling reports uniformly established the Property as free from any actionable contamination and the proposed Development Area as outside of any impacted areas. Based thereon, Summit County should have allowed RCA to proceed with development of the Property per the terms of the Development Agreement because RCA had satisfied the requirements of the Ordinance.

76.     Summit County's refusal to allow RCA to proceed with development pursuant to the terms of the Development Agreement, and at all relevant times thereafter,

77.     On or about March 22, 2017, and at all relevant times thereafter, Summit County breached the Development Agreement by, among other things, refusing to allow RCA to proceed with development of the Property, as agreed, despite extensive testing establishing the Property as free from any actionable contamination and that the proposed Development Area is outside of any impacted area.  Summit County's breach of the Development Agreement is ongoing as it continuously refuses to issue a development permit to RCA.

78.     RCA has performed in accordance with the terms and conditions of the Development Agreement except for any terms and conditions that were excused by Summit County's non-performance.

79.     As a direct and proximate result of Summit County's breach of the Development

Agreement RCA has suffered and will continue to suffer damages in an amount to be proven at trial.

80.     Pursuant to the Development Agreement, RCA is also entitled to recover all costs and expenses, including reasonably attorneys' fees, it has incurred and will incur in connection with the parties' dispute and RCA's pursuit of its remedies under the Development Agreement.

### SIXTH CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Advantage as to Defendants EPA and UPCM only)

81.     RCA realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though set forth in full herein.

82.     In 2006, RCA entered into a Development Agreement with Summit County to develop 18 one-acre lots on a portion of the Property that was included in the EPA's expansion of the boundaries of the Site.

83.     Defendants EPA and UPCM knew or should have known of the existence of the Development Agreement, which at all times encompassed certain property that the EPA and UPCM were responsible for characterizing and remediating pursuant to the 2014 AOC.

84.     Defendants EPA and UPCM acted negligently in that they knew or should have known that any failure to timely characterize or remediate OU2, which encompasses the Property, or the Dock and certain wetlands purportedly located on the Property, pursuant to the 2014 AOC would result in a disruption of the Development Agreement and RCA's ability to develop and sell portions of the Property.  The EPA further acted negligently in that it knew or should have known that any failure to assume or timely enforce UPCM's obligations under the 2014 AOC would result in further disruption of the Development Agreement and RCA's ability to develop and sell portions of the Property.

85.     Since at least 2009, but certainly since 2014, Defendants EPA and UPCM have failed to act with any promptness or diligence in characterizing and remediating any contaminated properties located within OU2 under the 2014 AOC, including any properties that could serve as the basis for including RCA's Property in OU2, if any.  The EPA further failed to act with any

promptness or diligence in assuming or enforcing UPCM's obligations pursuant to the 2014 AOC.

86. Defendants EPA and UPCM's dilatory conduct has, at this point, amounted to a misrepresentation of their ability or intent to comply with their obligations of the 2014 AOC, upon which RCA has always relied, to its detriment.

87. As a direct and proximate result of the EPA and UPCM's failure to comply with their obligations under the 2014 AOC, the EPA and UPCM have caused significant delay in RCA's ability to obtain a no further action letter or other certification to the satisfaction of Summit County and, in turn, a reduction in the Property's fair market value and RCA's ability to develop, effectively market, and sell the Property. Defendants EPA and UPCM's wrongful conduct has always been a substantial factor in RCA's harm, which has been damaged in an amount to be determined at trial.

88. Additionally, at all times alleged herein, Defendants EPA and UPCM's conduct was intentional, willful and malicious, or was carried out with a knowing and reckless indifference towards and a conscious disregard of, the rights of RCA, and RCA also prays that an award of punitive damages should issue therefore.

## SEVENTH CLAIM FOR RELIEF

### (Third Party Beneficiary as to the EPA and UPCM only)

89. RCA realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though set forth in full herein.

90. At all relevant times herein Defendant EPA and UPCM had entered first into the 2009 Settlement Agreement, and later the 2014 AOC.

91. At all times, Defendants EPA and UPCM intended that RCA, as the owner of the Property, which was designated under OU2, and was therefore subject to the remediation requirements imparted on Defendant UPCM under the 2009 and 2014 Agreements, receive a benefit from such agreements in the form of the remediation of any contaminated property that could have served as a basis for including RCA's Property in the OU2.

92. Defendants EPA and UPCM have breached the obligations of the 2009 and 2014

Agreements by failing to actually remediate the properties designated thereunder, and, in so doing, has deprived Plaintiff of the intended benefit of such Agreements, which would have resulted in a no further action letter, or other approval from EPA to develop the Property.

93.     Defendant UPCM's conduct was a substantial factor in bringing about Plaintiff's harm, and has damaged Plaintiff in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court grant the following relief:

**First Claim for Relief**

1.     A declaration from the Court that Defendants have violated, and continue to violate, the provisions of CERCLA §9604.

2.     An order from the Court pursuant to CERCLA §310, 42 U.S.C. §4659 that the EPA comply with the requirements of CERCLA and that EPA take such action to correct the violation.

3.     Affirmative injunctive relief requiring the EPA to remove the Property from the boundaries of OU2 and the Site or, in the alternative, that EPA issue a no further action letter regarding the Property that would satisfy the requirements of the Ordinance.

4.     In the alternative, an order from the Court requiring EPA to issue a final Record of Decision and complete any remaining cleanup activities related to the Property.

5.     Affirmative injunctive relief requiring UDEQ and Summit County to allow RCA to remove any and all warnings or restrictions from each plat on the Property, or alternatively, allowing RCA to propose and complete a cleanup plan that will satisfy the Ordinance.

6.     Attorneys' fees and costs of suit recoverable under 42 U.S.C. §9659(f) and 42 U.S.C. §4654.

7.     Such other and further relief as the court deems just and proper.

**Second Claim for Relief**

1.     A declaration from the Court that Defendant EPA has violated, and continues to violate, a non-discretionary duty as required under CERCLA, as described above.

2.     An order from the Court pursuant to CERCLA §310, 42 U.S.C.§4659 that

Defendant EPA comply with the requirements of CERCLA and take such action to correct the violation, issue a Record of Decision, and complete any cleanup activities related to the Property.

3.      Alternatively, to allow RCA to propose and complete a cleanup plan related to the Property.

4.      Attorneys' fees and costs of suit recoverable under 42 U.S.C. §9659(f).

5.      Such other and further relief as the court deems just and proper.

**Third Claim for Relief**

1.      Judgment for RCA in a sum to be proven at trial;

2.      Interest at the lawful rate from the date of the taking of RCA's property until the judgment is paid;

3.      Attorneys' fees and costs of suit recoverable under 42 U.S.C. §4654.

4.      Such other and further relief as the court deems just and proper.

**Fourth Claim for Relief**

1.      Judgment for RCA in a sum to be proven at trial;

2.      Interest at the lawful rate from the date of the taking of RCA's property until the judgment is paid;

3.      Attorneys' fees and costs of suit recoverable under 42 U.S.C. §4654.

4.      Such other and further relief as the court deems just and proper.

**Fifth Claim for Relief**

1.      Judgment for RCA in a sum to be proven at trial, including applicable pre-judgment interest;

2.      Attorneys fees and costs of suit pursuant to the Development Agreement;

3.      Such other and further relief as the court deems just and proper.

**Sixth Claim for Relief**

1.      Judgment for RCA in a sum to be proven at trial, including applicable pre-judgment interest;

2.      Attorneys' fees and costs of suit;

3.      Such other and further relief as the court deems just and proper.

**Seventh Claim for Relief**

      1.      Judgment for RCA in a sum to be proven at trial, including applicable pre-judgment interest;

      2.      Attorneys' fees and costs of suit;

      3.      Such other and further relief as the court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on any and all issues so triable pursuant to Federal Rule of Civil Procedure 38.


DATED: February 4, 2021        THE LAW OFFICE OF KENNETH J. MELROSE


               By /s/ Kenneth J. Melrose
                    Kenneth J. Melrose
                    Attorney for Plaintiff